UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Patricia Altendorfer,

       Plaintiff,

v.                                                                                            Civil No. 04-4822 (JNE/SRN)
                                                                                                 ORDER

Kroll Ontrack, Inc.,

       Defendant.

---

Eric D. Bull, Esq., Mulligan & Bjornnes PLLP, appeared for Plaintiff Patricia Altendorfer.

Natalie Wyatt-Brown, Esq., and Thomas E. Marshall, Esq., Jackson Lewis LLP, appeared for Defendant Kroll Ontrack, Inc.

---

      Patricia Altendorfer brought this action against her former employer, Kroll Ontrack, Inc. (Kroll), alleging that Kroll terminated her on the basis of her disability and failed to accommodate her in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213 (2000), and the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363A.01-.41 (2004). In addition, Altendorfer brought common law claims for negligent and intentional infliction of emotional distress. The case is before the Court on Kroll's motion for summary judgment and on Altendorfer's motion for partial summary judgment. For the reasons set forth below, the Court grants Kroll's motion and denies Altendorfer's motion.

## I.    BACKGROUND

      Altendorfer began working for Kroll as a Senior Human Resources Generalist on June 9, 2003. She was assigned to Kroll's Electronic Evidence Unit in Eden Prairie. Her responsibilities included recruiting and training, as well as managing employee relations and performance issues. In late August 2003, Altendorfer began to experience back pain, numbness

1

in her legs, difficulty walking, and blackouts. In the course of receiving medical treatment for her symptoms, Altendorfer learned that she had a tumor in her spine. After consulting with her physicians, she elected to have surgery to remove the tumor.

On August 29, 2003, Altendorfer informed her supervisor at Kroll of her medical condition and met with Kroll's benefits administrator to discuss her eligibility for short-term disability benefits. The benefits administrator informed her that she would be eligible for disability benefits after September 7, 2003, her ninetieth day of employment. Based on this representation, Altendorfer scheduled her surgery for September 12, 2003. On September 3, 2003, three months into her employment, Altendorfer formally requested a six-week leave of absence for surgery to remove the tumor. On September 9, 2003, Kroll's benefits administrator informed Altendorfer that she had miscalculated Altendorfer's eligibility for short-term disability benefits and that she would not be eligible until October 1, 2003. Altendorfer requested reconsideration, which Kroll initially denied but eventually granted.

Altendorfer had surgery, as planned, on September 12, 2003. As a result of the surgery, she suffered nerve damage, which caused her to lose feeling and motor function in her lower extremities. She began a course of rehabilitation to improve her condition. That rehabilitation took longer than expected, and, on October 15, 2003, she informed Kroll that she would not be able to return to work until November 19, 2003. She requested additional unpaid leave to that date.

By letter dated October 20, 2003, Kroll granted Altendorfer's request for additional leave. The letter stated:

> As you know, you have been off work since September 12, 2003 and due to conversations with Jennifer Schultz and I, your requested time off of six weeks was approved as unpaid leave for that time period. Also, you are aware that

because you have not been working with the company for one year, you do not qualify for Family and Medical Leave Act leave.

On October 15, 2003 you informed us that you are not able to return to work until November 19, 2003 which has been estimated by your health care provider. You and your health care provider also informed us that you would be evaluated for final clearance for work in 4-6 weeks from October 8, 2003.

You will need to keep us informed as to your plans with regard to your time away from work and your potential return to work. At this point, we have redistributed your workload to others within the company. However, at some point in the near future, it may become necessary to fill your position to meet our business needs. We are approving the additional time off you've requested as unpaid leave through November 19th. If you are unable to return to work at that time we will not be able to hold your job open and will move forward with termination of your employment.

In the event you are able to return to work, we will consider you for assignment to positions which are available at that time. This may or may not include your current position. In addition, at the point at which you are ready to return to work, we will need a fitness for duty certification.

On November 12, 2003, Altendorfer forwarded to Kroll a letter from her doctor, Dr. Mark S. Gordon, indicating that she would not be able to return to work by November 19. Dr. Gordon's letter stated:

> Patricia Altendorfer is a 39-year-old woman who developed a spinal cord tumor in September 2003. Following surgical excision of the tumor at Abbott Northwestern Hospital, she continued to have neurologic deficits including lower extremity weakness, loss of sensation, and proprioceptive deficits affecting her ability to work.
>
> Patricia was admitted to Sister Kenny Rehabilitation Institute on September 17, 2003 for acute inpatient rehabilitation and discharged to her home on September 29. She continues to require ongoing physical therapy. I most recently saw Patricia in clinic on October 27, 2003, and can verify that she is not yet ready to return to work, though she is slowly improving. I expect that her progress will continue and that she may be ready to return to work in late December to early January.

After receiving the note, Kroll determined that termination was appropriate. On November 19, 2003, Aaron Curti, Altendorfer's supervisor, called Altendorfer to inform her of

3

the decision. During the conversation, Altendorfer indicated to Curti that she wanted to return to work but that she was "not going to go against doctor's orders." She also indicated that she did not understand why she was being terminated. In response, Curti assured Altendorfer that the decision had nothing to do with her performance, but was instead based on her inability to work. Curti's explanation of Kroll's decision was reiterated in a letter to Altendorfer that bore the same date. The letter stated:

> Please accept this letter as a follow-up to our conversation on October 20, 2003. As you know, you informed us on October 15, 2003 that you were not able to return to work until November 19, 2003 which was estimated by your health care provider at the time. Kroll Ontrack agreed to approve this additional time off as unpaid leave, which provided you a total of nine and a half weeks of unpaid leave from the start of your request.
>
> Subsequently, on November 13, 2003 you and your health care provider informed us that you are unable to return to work on November 19th, but may be ready to return to work in late December to early January. As we previously discussed, I informed you that we are not able to hold your job open beyond November 19th.
>
> At this time, because you have informed us that you are not medically able to continue in your position as a Sr. Human Resources Generalist your employment with Kroll Ontrack will end on November 19, 2003. Should your situation change and you are interested in pursuing further employment opportunities with Kroll Ontrack you are welcome to inquire through our Human Resources department.
>
> Kroll Ontrack thanks you for your contributions during your employment and hopes the very best for you in the future.

Since her surgery and termination, Altendorfer has experienced depression, loss of sleep, and loss of appetite, among other things. Her neurologic deficits have improved with rehabilitation and time, but are, at least to some extent, permanent.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.     ADA and MHRA claims**

Altendorfer alleges two theories of liability under the ADA and MHRA: disparate treatment and failure to accommodate. Because these two theories of liability are distinct, *see Voeltz v. Arctic Cat, Inc.*, 406 F.3d 1047, 1051 (8th Cir. 2005), the Court analyzes them separately.

*1.     Disparate treatment*

The Court analyzes Altendorfer's ADA and MHRA disparate treatment claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Wilking v. County of Ramsey*, 153 F.3d 869, 872 (8th Cir. 1998). To establish a prima facie case under the ADA or the MHRA, a plaintiff must show that: (1) she is disabled within the meaning of the ADA or the MHRA; (2) she is qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. *Id.*; *see also Alexander v. Northland*

*Inn*, 321 F.3d 723, 726 (8th Cir. 2003). "Once the plaintiff establishes her prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions." *Wilking*, 153 F.3d at 872-73. If the employer meets this burden, the plaintiff then bears the burden of demonstrating that the employer's stated reason is a pretext for discrimination. *Id*. at 873. "At all times, the plaintiff bears the ultimate burden of demonstrating that discrimination was the real reason for the employer's actions." *Id.*

Kroll argues that Altendorfer has failed to offer any evidence that she was qualified to perform the essential functions of her job with or without a reasonable accommodation and has therefore failed to establish a prima facie case of disparate treatment. Kroll also argues that Altendorfer has failed to demonstrate that the legitimate, nondiscriminatory reason it offers for its action is pretextual.

The Court turns first to Kroll's argument that Altendorfer was not qualified to perform her job. To make a prima facie showing that she is qualified, Altendorfer must demonstrate that she meets the essential prerequisites for the job, such as basic education, experience, and training. *See Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 786 (8th Cir. 2004). She must also demonstrate that she can perform the essential functions of the job with or without a reasonable accommodation. *See id*. The parties agree that Altendorfer meets the essential prerequisites for the position of Senior Human Resources Generalist and that, at the time she was terminated, she would have required an accommodation to perform her job. However, the parties dispute whether Altendorfer was able to perform the essential functions of her job with reasonable accommodation. Altendorfer maintains that a second extended leave and permission to work from home were among the accommodations that would have permitted her to perform her job.

Under appropriate circumstances, an unpaid leave of absence can be a reasonable accommodation. *See Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 n.3 (8th Cir. 1999). In this case, however, Altendorfer's request for further unpaid leave was not reasonable. The undisputed evidence demonstrates that, at the time of her termination, Altendorfer was both unable to work and unable to specify when she would be able to return. Even her doctor's November 12, 2003, letter failed to provide a definite return date.[1] Under these circumstances, the Court concludes that a second extended leave would not have been a reasonable accommodation. *See Hudson v. MCI Telecomm. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996) (holding that unpaid leave of indefinite duration does not qualify as a "reasonable accommodation"), *cited with approval in Browning*, 178 F.3d at 1049 n.3.

Altendorfer also claims that she would have been able to perform her job if Kroll would have permitted her to work from home full-time. She maintains that this accommodation would have been reasonable, as demonstrated by the fact that, prior to her disability, Kroll permitted her to work from home in the evenings and on weekends. However, the undisputed evidence in the record reveals that Altendorfer's job duties required her physical presence at Kroll. Among those duties were interviewing candidates for employment, coaching and counseling employees, performing employee investigations, conducting exit interviews, and identifying and conducting training programs. *See Alexander*, 321 F.3d at 727 (holding that task was an essential function of plaintiff's job where plaintiff was only occasionally required to perform the task). That Kroll permitted Altendorfer to work from home in the evenings and on weekends before her surgery does not demonstrate that working from home full-time would have been feasible. On the

---

[1] At her deposition, Altendorfer testified that the letter was not intended to establish a definite return date. Indeed, in light of the uncertain phrasing of the note and the fact that Altendorfer had already sought and been granted an extension of her original leave of absence, no reasonable factfinder could conclude that the letter set forth a definite return date.

7

contrary, the undisputed evidence is that, during business hours, she was required to be physically close to the unit with which she worked. In fact, after her first month of employment, Kroll moved her from an office in the building housing the Human Resources Department to a cubicle in a different building housing the Electronic Evidence Unit for precisely that reason. *Cf. Gits v. Minn. Mining & Mfg. Co.*, Civ. No. 99-1925, 2001 WL 1409961, at *9 (D. Minn. June 15, 2001) (holding that working from home was not a reasonable accommodation where employees' duties included supervising a laboratory team).

In sum, Altendorfer cannot demonstrate that she is a qualified individual under the ADA or MHRA. Thus, she cannot establish a prima facie case and her disparate treatment claims fail as a matter of law.

### 2. *Failure to accommodate*

The Court next turns to Altendorfer's failure-to-accommodate claims. These claims are analyzed under a modified burden-shifting scheme. *See Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004). "This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive. The *McDonnell Douglas* line of cases, however, is aimed at fleshing out this 'elusive factual question of intentional discrimination.'" *Id.* As with her disparate treatment claims, Altendorfer must demonstrate that: (1) she was disabled within the meaning of the ADA or MHRA; (2) she was qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. *See Kammueller*, 383 F.3d at 784; *see also Peebles*, 354 F.3d at 767 & n.6. In addition, Altendorfer must demonstrate that: (4) Kroll knew about her disability; (5) she requested accommodations or assistance for her disability; and (6) Kroll did not make a good faith effort to

assist her in seeking accommodations. *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002). If she satisfies this burden, "the employer is left to show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Peebles*, 354 F.3d at 768 (quotations omitted). For the reasons discussed above, Altendorfer has failed to demonstrate that she was qualified to perform her job—with or without accommodation—at the time she was terminated. Her failure-to-accommodate claim therefore fails as a matter of law.

**B.    Common law claims**

Altendorfer also alleges claims of negligent infliction of emotional distress and intentional infliction of emotional distress.[2] Kroll argues that these claims are preempted by the MHRA and that the claims fail on their merits. The Court agrees that the claims fail on their merits.[3]

*1.    Negligent infliction of emotional distress*

To prevail on a claim for negligent infliction of emotional distress, a plaintiff must demonstrate that she: (1) was within a zone of danger of physical impact; (2) reasonably feared for her own safety; and (3) suffered severe emotional distress with attendant physical manifestations. *See K.A.C. v. Benson*, 527 N.W.2d 553, 557 (Minn. 1995); *Flowers v. City of*

---

[2] Count Two of Altendorfer's Complaint is labeled "Negligence" and Count Three of Altendorfer's Complaint is labeled "Negligent and Intentional Infliction of Emotional Distress." In support of its motion for summary judgment, Kroll asserted that Altendorfer's allegations in Count Two appear to be identical to the negligent infliction of emotional distress allegations in Count Three. Altendorfer did not respond to Kroll's argument and, upon review of Altendorfer's Complaint, the Court agrees that Count Two simply alleges negligent infliction of emotional distress with the same factual predicate as the negligent infliction of emotional distress claim contained in Count Three. The Court therefore concludes that Altendorfer has alleged common law claims for negligent infliction of emotional distress and intentional infliction of emotional distress.

[3] In light of the Court's conclusion on the merits of these claims, the Court declines to address the merits of Kroll's preemption argument.

9

*Minneapolis*, Civ. No. 04-3959, 2006 WL 453206, at *8 (D. Minn. Feb. 22, 2006). "If a plaintiff can not demonstrate [she] was within the 'zone of danger,' this element may be filled by demonstrating that the plaintiff was the victim of malicious prosecution, defamation, or other willful, wanton, or malicious conduct." *Flowers*, 2006 WL 453206, at *8; *see also Stead-Bowers v. Langley*, 636 N.W.2d 334, 343 (Minn. Ct. App. 2001).

Here, Altendorfer was never in a zone of danger of physical impact. *See Vang v. Clearr Corp.*, Civ. No. 04-4306, 2005 WL 3088360, at *5 (D. Minn. Nov. 17, 2005) ("A claim for negligent infliction of emotional distress is intended to remedy 'physically risky, calamitous events.'"). Moreover, she has not offered any evidence supporting an inference that she was the victim of malicious prosecution, defamation, or other willful, wanton, or malicious conduct. Although Kroll informed Altendorfer that it had miscalculated her eligibility for short-term disability benefits shortly before her surgery, she has not pointed to any evidence that its miscalculation or the timing of Kroll's communication was willful, wanton, or malicious.[4] Moreover, there is no evidence supporting the conclusion that the manner or timing of her termination was willful, wanton, or malicious. Accordingly, Altendorfer's negligent infliction of emotional distress claim fails as a matter of law.

2. *Intentional infliction of emotional distress*

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that: (1) the complained of conduct was extreme and outrageous; (2) the conduct

---

[4] In her Complaint and during discovery, Altendorfer alleged that the manner and timing of her termination forms the basis for her emotional distress claims. At summary judgment, Altendorfer further alleged—for the first time—that Kroll's initial denial of short-term disability benefits is a basis for her emotional distress claims. Because the alleged denial of short-term disability benefits is a new factual basis for her claims, the allegation is not properly before the Court. Even if the allegation were properly before the Court, as discussed above, the allegation is not supported.

was intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress is severe. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983). To be "extreme and outrageous," conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Id.* at 439 (quotations omitted).

Altendorfer cannot demonstrate that Kroll's conduct was extreme and outrageous. The record is undisputed that Kroll granted her more than nine weeks of leave notwithstanding the fact that she had only been at the company for three months; commended her good work; and invited her to reapply for open positions when she became able to work again. Altendorfer's intentional infliction of emotional distress claim therefore fails as a matter of law.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Kroll's Motion for Summary Judgment [Docket No. 15] is GRANTED.

2. Altendorfer's Motion for Partial Summary Judgment [Docket No. 14] is DENIED.

3. This case is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  May 12, 2006

                                          s/ Joan N. Ericksen
                                          JOAN N. ERICKSEN
                                          United States District Judge